UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| J.A., ex rel., T.L and C.A, her natural parents and guardians, | Civil File No. 14-cv-4639 (ADM/LIB) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** **COMPLAINT** |
| v. | |
| Moorhead Public Schools, ISD No. 152, | |
| Defendants. | **JURY TRIAL REQUESTED** |

---

For their Complaint, Plaintiffs J.A., and her parents and natural guardians, T.L. and C.A.(collectively Plaintiffs) state as follows:

**I.     INTRODUCTION**

T.L. and C.A., on behalf of their minor child, J.A., a child with disabilities, request injunctive and compensatory relief under the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. Section 794; the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01, *et seq.* against the Moorhead Public Schools (Moorhead)(MPS)or (Defendant) for disability discrimination.

J.A. is a five year old child with Down syndrome, who lives with her parents, T.L. and C.A. in Moorhead, Minnesota.  She attends kindergarten at Robert Asp Elementary within Moorhead Public Schools (Moorhead).  Her parents discovered, on the 19th of October 2014, that J.A. was required to spend a portion of her school day in a storage closet at Robert Asp.  Since the discovery of the storage closet, T.L. and C.A. are pursuing emergency injunctive relief prior to returning J.A. to Robert Asp.  The storage closet is an unjustified isolation, confinement and seclusion of a child with a disability in violation of J.A.'s rights under Section 504, the ADA,

and the MHRA (MHRA). Plaintiff assert that Moorhead's conduct denies J.A. of comparable access and facilities to a child with a disability. The storage closet does not comply with basic state building, fire, and safety codes. No non-disabled peers are subjected to such isolation, confinement or inferior facilities.

## II. JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the ADA, Section 504 and Section 1983.

2. J.A. and her parents are excused from exhausting their administrative remedies under 20 U.S.C. § 1415(i) because injunctive relief to change the education facilities for an individual with a disability is not available under the IDEA.

3. The Plaintiffs claims and remedies are authorized by 29 U.S.C. § 794(a); 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983 and provide for declaratory, compensatory and any further relief deemed necessary and proper.

4. Venue in this United States District Court is authorized by 28 U.S.C. § 1391(b) because the Defendant conducts business or reside in this United States District Court, and because this is where a substantial part of the events or omissions giving rise to the claim occurred. Venue is appropriate in this United States District Court pursuant to 28 U.S.C. § 1391.

## III. STATUTORY AND REGULATORY BACKGROUND

5. Section 504 provides protections for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 *et seq*.

6. Under Section 504, a "handicapped person" is defined as "any person who has a physical

or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "major life activities" is defined as "functions such as caring for one's self . . . learning." *Id.*

7.    Section 504 mandates the public school systems to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA by requiring that:

> a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart.

34 C.F.R. § 104.32.

8.    Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met, and (ii) are based on adherence to the procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

9.    Section 504 has a reasonable accommodations section:

> A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

28 C.F.R. § 41.53; 28 C.F.R. 35.130(b)(7).

10.    Section 504 and ADA are interchangeable in many respects. *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998). The MHRA essentially provides the same protection as the ADA.

*Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001).

11. The ADA prohibits a public school from discriminating against a qualified individual with a disability. A "qualified individual with a disability." The ADA defines a disability as:

> A physical or mental impairment that substantially limits one or more of the major life activities of such an individual . . . a record of impairment or being regarded as having such an impairment.

42 U.S.C. § 12102(2)(A)-(C).

12. As with Section 504, the ADA recognizes "learning" as a major life activity. 29 C.F.R. § 1630.2(i).

13. The United States Supreme Court recognized that Congress had specifically instructed that an "integration regulation", modeled on Section 504, be included in the ADA:

> A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

28 CFR § 35.130(d) (1998); *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176 (1999).

14. Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination." See §12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); §12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including . . . segregation"); see also *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 461 (1985).

## IV. PARTIES

15. J.A. is a five year-old girl born on 30 December 2008. She lives with her parents, T.L. and C.A., in Moorhead, Minnesota. She weighs 41 pounds.

16. T.L. and C.A. are the parents and legal guardians of J.A.

17.     Independent School District 152, Moorhead Public Schools is a school district (a government entity) with its principal place of business at 2410 - 14th Street South, Moorhead, Minnesota, 56560.

## V.  FACTS

18.     J.A. is a five year old girl who was diagnosed with Down syndrome in infancy. Moorhead has identified J.A. as a child with a disability under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, et seq.   She is attending her kindergarten year at Robert Asp Elementary.  J.A. receives special education and related services under an individualized education program (IEP).  Moorhead designated her eligible under state criteria of developmentally delayed and speech and language impairment.  Her IEP provide J.A. with goals and objections, special education and related services, modifications and accommodations in her education program but does not address the physical facilities wherein the education program will take place.

19.     J.A. is non-verbal and her central need is to learn to communicate through words and sign language.  J.A. communication skills are compromised and she is unable to express her wants and needs or to self-report any misconduct.  She has been learning to imitate sounds and words and to communicate through a limited series of signs.  She requires hand-over-hand assistance with her academics, peer interaction, motor skills such as cutting paper, using crayons, gluing, pasting, hand washing, requesting snacks through sign language, and getting into and out of her outdoor clothing.  J.A. is to receive direct special education services from a special education teacher for academics, occupational, speech and language, and physical therapies.  The special education teacher spends 50 minutes per day with J.A.  The occupational therapist spends 20 minutes with J.A. two times per week, the speech language therapist works with J.A. 20 minutes

4 times a week and the physical therapist works with J.A. 20 minutes 3 times per week. According to J.A.'s IEP, the remainder of her school day is to be in the mainstream classroom with her peers.

20.     On the 13th of October 2014, during parent-teacher conferences, J.A.'s parents, T.L. (T.L.) and C.A. (C.A.) discovered, for the first time, that J.A. was being taken to a storage closet during part of her education day.  T.L. was taken on a tour of J.A.'s classrooms.  T.L. was shown the regular education classroom, a special education resource room, a special education time-out room and a storage closet.

21.     Prior to the parent-teacher conference, T.L. and C.A. had not seen or heard of the time-out room.  Moorhead had not informed T.L. or C.A. that a time-out room would be consistently used with J.A..  T.L. expressed her deep reservations and concerns regarding the time out room. At the time of the tour, T.L. recognized J.A.'s water bottle which was in the time out room. J.A.'s IEP did not identify that a time out room will be a routine part of J.A.'s education day.[1] During the tour of J.A.'s classrooms, T.L. was shown the storage closet and told that it was one of J.A.'s classrooms.

22.     The storage closet is a narrow room approximately 8 x 18, lined on each sides with open metal filing cabinets and file boxes. See attachment no. 1.  In the narrow aisle between the metal shelving and boxes, a large colored mat had been placed with each side of the mat touching the metal shelving and boxes.  At the back of the closet was a rocking chair up against the back wall and under an unlocked fuse box.  In addition, a small desk with a computer screen was up against the back wall.  There were no windows in the closet or on the door.  The door was a heavy, fire door that J.A. would not be able to open on her own.  See attachment no. 2.

---

[1] J.A. has had several instances of pulling hair and biting.  However, the incident reports are so brief that no useful educational information for the purpose of intervening can be extrapolated.

The storage closet was not properly ventilated, heated or kept clean. J.A. has significant allergies and has experienced a higher than average allergic responses this school year. The storage closet does not comply with state building, fire and safety codes. It was dusty, crowded, and secluded. On information and belief, the storage closet door was not connected to an automatic fire detection, alarm and sprinkler system. J.A. cannot consent to being isolated and confined in a storage closet and was precluded from leaving either by whomever placed her there and/or due to the weight of the door.

23. T.L., upon seeing the storage closet, stopped the tour in a state of shock and immediately left the school to speak with J.A.'s father, C.A. C.A. and T.L. returned the same day to speak with the principal at Robert Asp and to take pictures of the storage closet. The principal, Christopher Triggs (Triggs), was not available.

24. C.A. and T.L. returned to Robert Asp the next morning on the 14th of October 2014 to meet with the principal. T.L. and C.A. were visibly upset and asking questions about the storage closet. Triggs asserted that this storage closet was used with other special needs children and had been used before. C.A. asked whether the building blueprint would reflect that the room J.A. was in was a storage closet. Triggs confirmed that C.A. was correct. Triggs stated that the reason children with disabilities were being placed into the closet was due to construction and a lack of space. He stated that the person who gave T.L. the tour was wrong to show her that room. When C.A. and T.L. stated they had no intention of returning J.A. to Robert Asp, Triggs told both T.L. and C.A. that it was against the law to keep J.A. from her education. Both T.L. and C.A. understood Triggs to mean that they would be in trouble with the law if they refused to return J.A.[2]

---

[2] The Minnesota Compulsory Attendance statute requires that children beginning at the age of seven are required to be in school. Minn. Stat. 120A.22, subd. 5.

25.     Unable to answer any of the Plaintiffs' basic questions regarding J.A.'s placement in the storage closet, Triggs took notes during the meeting and deferred answering any questions until he could consult with his supervisors and gather more information. Triggs scheduled a meeting between himself, T.L. and Pat Sullivan (Sullivan), a Moorhead special education coordinator, for the following day.

26.     In the early evening of the 15th of October 2014, T.L. met with Triggs and Sullivan. Neither C.A. nor T.L. wanted J.A. to return to Robert Asp and T.L. repeatedly stated that throughout the meeting. Triggs responded to T.L. by stating to her that it was against the law to keep J.A. from her education. T.L. understood Triggs to mean that if she kept J.A. out of school, she would be in trouble with the law. Sullivan and Triggs informed T.L. that they were willing to permit J.A. to remain at home until the 22nd of October 2014. During this meeting Sullivan appeared upset and teary and repeatedly apologized to T.L. Triggs also repeatedly apologized. Neither Triggs nor Sullivan discussed the storage closet with T.L. and were unable or unwilling to answer T.L. and C.A.'s questions including how J.A. came to be confined in the closet, how many times she was in the closet, for what period of time, who went with her, and what was she doing in the closet. Triggs agreed to make minor personnel changes, stated that the storage closet would not be used with J.A. and that he had located another classroom for her. T.L. was shown the new classroom. Throughout the meeting and subsequent tour, T.L. repeated that she did not want J.A. to return to Robert Asp. Both Sullivan and Triggs were focused on getting J.A. back into school because, as Triggs and Sullivan asserted, it was "against the law for [J.A.] not to be returned."

27.     J.A. in September 2014 began refusing to go to school and tantrum to avoid it. She regressed in her communication skills at home. J.A. also experienced an increase in her allergy

symptoms throughout the year.

28.     J.A. was returned to Robert Asp on the 22nd of October 2014 because the Plaintiffs feared that they would be charged with a crime for not returning J.A. to school.  During this time, Plaintiffs began to look for counsel to represent J.A.  Counsel advised the Plaintiffs regarding the compulsory attendance requirements and recommended that J.A. not be returned to Robert Asp until the use of the storage closet with J.A. and other disabled students is ceased.  J.A. ceased to attend public school at Robert Asp on the 31st of October 2014 due to the unlawful conditions in which she was being educated.

29.     T.L. and C.A. have received nothing in writing from MPS reflecting that it will immediate stop the practice of isolating, confining and segregating children with disabilities, including J.A., into a storage closet as part of their education day.  Contrary to what Triggs told T.L. and C.A., another educator confirmed to T.L., that the storage closet has been in existence for at least five years.

30.     J.A. is unable to report if she has been taken back to the storage closet.  Plaintiffs are seeking emergency injunctive relief to temporarily and permanently restrain MPS from the use of a storage closet for any educational purposes with J.A. or any other special needs child.

**MOORHEAD PUBLIC SCHOOLS – PATTERN AND PRACTICE/CONTINUING VIOLATIONS**

31.     Moorhead Public Schools was sued in 2006 for educating a young man with autism who was nonverbal in a broom closet (Civil File No. 06-3099).  Despite the prior lawsuit, Moorhead continued the practice of using unequal facilities that isolated, confined and secluded children with disabilities.  Triggs informed T.L. that the storage closet described herein has been used for the past five years for the purpose of educating children with disabilities.  On information and belief, Plaintiffs assert that the children who are sent to the storage closet are children who are

non-verbal and, therefore, unable to report the conditions under which they are being educated.

32.     The storage closet has not been registered as a *seclusion room* with the Minnesota Department of Education (MDE) as required by statute.  Minn. Stat. 125A.0942, Subd. 3(a)(7)(ii).  The storage closed has not been inspected by the fire marshal for use as a classroom and does not comply with building, fire and safety codes. See Minn. Stat. 125A.0942, subd. 3(6)(1) and 3(5)(v)(seclusion); Minn. R. 7511.1008, subp. 3(fire); Minn. R. 1305.1008, subp. 8 (building).

33.     Moorhead Public School educators have not been properly trained regarding disability discrimination and the unlawful practices of isolating, confining and secluding children with disabilities.  No one within MPS or Robert Asp has provided sufficient supervision or oversight of the educators to intervene on and stop the practice of using a substandard facility like a storage closet for the purposes of isolating, confining and segregating children with a disabilities. The storage closet has not been identified as part of J.A.'s school day on any document related to her education.  But for the tour given to T.L., she would have never known about the use of a storage closet with J.A.

34.     MPS has a pattern and practice of isolating, confining and secluding children with disabilities into substandard facilities. In 2006, MPS was sued for confining a young man with autism in a broom closet for part of his education day (Civil File No. 06-3009).  On information and belief, Moorhead agreed in 2006 to cease the unlawful practice of putting children with disabilities into isolating, confining, segregated and substandard facilities such as a broom or storage closet.

## VI. CLAIMS

### COUNT ONE

### SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C. § 794

35. The Plaintiffs incorporate by reference paragraphs 1 - 34, as well as the Introduction as if fully set forth herein.

36. Defendant Moorhead received federal funds and is a public entity as that term is used by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

37. Moorhead violated Section 504 by unjustifiably isolating J.A. from her non-disabled peers when Moorhead placed J.A. into a storage closet for the purposes of educating her. No other non-disabled student was required to be placed into a substandard facilities such as a storage closet that does not, at a minimum, comply with state building, fire, and safety codes, to obtain an education.

38. Moorhead discriminated against J.A. on the basis of a disability when it required she be educated in a storage closet that was not equal to the classroom provided to her non-disabled peers. As a consequence, an education environment hostile to J.A. and her rights has been created at Robert Asp Elementary.

39. Moorhead violated Section 504 by subjecting J.A. to disability discrimination based on her disability as set forth herein and by failing to have adequate policies, procedures, protocols, training, supervision and oversight to ensure J.A. was not subjected to such discriminatory practices.

40. Moorhead's violations of J.A.'s rights under Section 504 were intentional, grossly, recklessly and deliberately indifferent to those rights. And as a result of Defendant Moorhead's discriminatory conduct, Plaintiffs were injured.

## COUNT TWO

### AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12131-65

41.     The Plaintiff incorporates paragraphs 1 through 40 as though fully set forth herein.

42.     Defendant Moorhead is a public entity at that term is used by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

43.     Moorhead violated the ADA by unjustifiably isolating J.A. from her non-disabled peers when Moorhead placed J.A. into a storage closet for the purposes of educating her.  No other non-disabled student is required to be placed into a substandard facilities such as a storage closet that does not, at a minimum, comply with state building, fire, and safety codes, to obtain an education.

44.     Moorhead discriminated against J.A. on the basis of a disability when it required she be educated in a storage closet that was not equal to the classroom provided to her non-disabled peers. As a consequence, an education environment hostile to J.A. and her rights has been created at Robert Asp Elementary.

45.     Moorhead violated the ADA by subjecting J.A. to disability discrimination based on her disability as set forth herein and failing to have adequate policies, procedures, protocols, training, supervision and oversight so as to ensure J.A. was not subject to discrimination

46.     Moorhead's violations of J.A.'s rights under the ADA were intentional, grossly, recklessly and deliberately indifferent to those rights.  And as a result of Defendant Moorhead's discriminatory conduct, Plaintiffs were injured.

## COUNT THREE

### MINNESOTA HUMAN RIGHTS ACT
### MINN. STAT. § 363A

47.     The Plaintiff incorporates paragraphs 1 through 46 as though fully set forth herein.

48.     Defendant Moorhead is a public service as that term is used by the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.03, subd 35.

49.     Moorhead violated the MHRA by unjustifiably isolating J.A. from her non-disabled peers when Moorhead placed J.A. into a storage closet for the purposes of educating her.  No other non-disabled student is required to be placed into a substandard facilities such as a storage closet that does not, at a minimum, comply with state building, fire, and safety codes, to obtain an education.

50.     Moorhead discriminated against J.A. on the basis of a disability when it required she be educated in a storage closet that was not equal to the classroom provided to her non-disabled peers. As a consequence, an education environment hostile to J.A. and her rights has been created at Robert Asp Elementary.

51.     Moorhead violated the MHRA by subjecting J.A. to disability discrimination based on her disability as set forth herein and failing to have adequate policies, procedures, protocols, training and oversight so as to ensure J.A. was not subject to discrimination.

52.     Moorhead's violations of J.A.'s rights under the MHRA were intentional, grossly, recklessly and deliberately indifferent to those rights.  And as a result of Defendant Moorhead's discriminatory conduct, Plaintiffs were injured.

## VII.  RELIEF

**THEREFORE,** Plaintiffs respectfully request that this court:

1. An order granting Plaintiffs a preliminary and permanent injunction stopping Moorhead from educating children with disabilities in unequal education facilities, in facilities that isolate, confine and segregated and in facilities that do not comply with state building, fire and safety codes.

2. A declaratory judgment that Moorhead's pattern and practice of isolating, confining and segregating children with disabilities is disability discrimination under Section 504, the ADA and MHRA.

3. An order requiring Moorhead to take such affirmative steps as necessary, including training and supervision, to ensure that no child with a disability, including J.A., is the subject of isolation, confinement and segregation in MPS education programs.

4. An order directing Moorhead to pay Plaintiffs compensatory damages for the emotional injuries the Plaintiffs suffered as a result of Moorhead unlawful actions in the amount of at least $75,000.00.

5. Order Defendant to pay treble damages pursuant to Minn. Stat. §§ 363A. 33, Subd. 6 and 363A.29, Subd. 4.

6. Award Plaintiffs their statutory attorney's fees and expenses.

7. Provide such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: 4 November 2014        /s/ Margaret O'Sullivan Kane
Margaret O'Sullivan Kane /ID # 220243
Attorney for Plaintiffs
420 Summit Avenue
Suite 306
Saint Paul, Minnesota 55102
651/222-8611

**VERIFICATION**

I verify that I have read the foregoing Complaint, and that all of the facts and statements made therein are true and correct to the best of my knowledge, and as to those facts stated on information and belief, I also believe them to be true and correct.

Dated: 4 November 2014        /s/ T.L.
T.L.

Subscribed and sworn to before me
this ____ day of November 2014.

_____
Notary Public

14