UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| J.A., ex rel., T.L and C.A, her natural parents and guardians, | Civil File No. 14-cv-4639 (ADM/LIB) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| Moorhead Public Schools, ISD No. 152, | |
| Defendants. | |

## INTRODUCTION

Defendant argues that this Court lacks subject matter jurisdiction for disability discrimination claims under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act or pendant state disability discrimination claims under the Minnesota Human Rights Act ("MHRA") because Plaintiffs did not exhausted their administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). Neither the governing statutes, the Eighth Circuit Court of Appeals nor this Court's case law support a dismissal of disability discrimination claims consistent with Defendant's position. See *M.P. v. Indep. Sch. Dist. No. 721, New Prague*, 439 F.3d 865 (8th Cir. 2006); *A.P. v. Anoka-Hennepin, Indep. Sch. Dist. 11*, 538 F.Supp.2d 1125 (D. Minn. 2008).

## STATEMENT OF FACTS

J.A. is a five year old girl who was diagnosed with Down syndrome in infancy. *Affidavit of T.L.* [Docket No. 1 and 7]. Moorhead has identified J.A. as a child with a disability under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq*. *Aff. of T.L., attachment 3*. She should be attending her kindergarten year at Robert Asp Elementary. J.A. receives special

1

education and related services under an individualized education program (IEP). *Attachment 3*. Moorhead designated her eligible under state criteria of developmentally delayed and speech and language impairment. *Id*. Her annual IEP provided J.A. with goals and objections, special education and related services, modifications and accommodations in her education program but does not address the physical facilities wherein the education program will take place. *Id*.

J.A. is non-verbal and her central need is to learn to communicate through words and sign language. *Aff of T.L. at ¶ 1, Aff. of C.A. at ¶1*. [Docket No. 8]. J.A. communication skills are compromised and she is unable to express her wants and needs or to self-report any misconduct. *Id.* She has been learning to imitate sounds and words and to communicate through a limited series of signs. *Id.* She requires hand-over-hand assistance with her academics, peer interaction, motor skills such as cutting paper, using crayons, gluing, pasting, hand washing, requesting snacks through sign language, and getting into and out of her outdoor clothing. *Verified Complaint at ¶19.* J.A. is to receive direct special education services from a special education teacher for academics, occupational, speech and language, and physical therapies. *Attachment 3*. The special education teacher spends 50 minutes per day with J.A. *Id*. The occupational therapist spends 20 minutes with J.A. two times per week, the speech language therapist works with J.A. 20 minutes 4 times a week and the physical therapist works with J.A. 20 minutes 3 times per week. According to J.A.'s IEP, the remainder of her school day is to be in the mainstream classroom with her peers. *Id*.

On the 13th of October 2014, during parent-teacher conferences, J.A.'s parents, T.L. (T.L.) and C.A. (C.A.) discovered, for the first time, that J.A. was being taken to a storage closet during part of her education day. *Aff of T.L. at ¶ 5.* T.L. was taken on a tour of J.A.'s classrooms. T.L. was shown the regular education classroom, a special education resource room,

a special education time-out room and a storage closet. *Aff. of T.L. at ¶5.*

Prior to the parent-teacher conference, T.L. and C.A. had not seen or heard of the time-out room. *Aff. of T.L. at ¶ 6.* Moorhead had not informed T.L. or C.A. that a time-out room would be consistently used with J.A. *Id.* T.L. expressed her deep reservations and concerns regarding the time out room. At the time of the tour, T.L. recognized J.A.'s water bottle which was in the time out room. *Id*. J.A.'s IEP did not identify that a time out room will be a routine part of J.A.'s education day.[1] *Attachment 3.* During the tour of J.A.'s classrooms, T.L. was shown the storage closet and told that it was one of J.A.'s classrooms. *Aff. of T.L. at ¶¶5-6.*

The storage closet is a narrow room approximately 8 x 18, lined on each sides with open metal filing cabinets and file boxes. *Aff. of T.L. at ¶7*; *Attachment 1.* In the narrow aisle between the metal shelving and boxes, a large colored mat had been placed with each side of the mat touching the metal shelving and boxes. *Id.* At the back of the closet was a rocking chair up against the back wall and under an unlocked fuse box. *Id.* In addition, a small desk with a computer screen was up against the back wall. *Id.* There were no windows in the closet or on the door. *Attachment No. 2*. The door was a heavy, fire door that J.A. would not be able to open on her own. *Id*. The storage closet is not properly ventilated, heated or kept clean. *Aff. of T.L. at ¶ 7*; *Attachment 1.* J.A. has significant allergies and has experienced a higher than average allergic responses this school year. *Aff. of T.L. at ¶ 7.* The storage closet was did not comply with state building, fire and safety codes. *Aff. of T.L. at ¶ 7; Aff. of C.A. at ¶3.* It was dusty, crowded, and secluded. *Id*. On information and belief, the storage closet door was not connected to an automatic fire detection, alarm and sprinkler system. *Id.; Verified Complaint at ¶ 22.* J.A. cannot consent to being isolated and confined in a storage closet and was precluded

---

[1] J.A. has had several instances of pulling hair and biting. However, the incident reports are so brief that no useful educational information for the purpose of intervening can be extrapolated.

from leaving either by whomever placed her there and/or due to the weight of the door. *Id*.

T.L., upon seeing the storage closet, stopped the tour in a state of shock and immediately left the school to speak with J.A.'s father, C.A. *Aff. of T.L. at ¶6*. C.A. and T.L. returned the same day to speak with the principal at Robert Asp and to take pictures of the storage closet. *Aff. of T.L. at ¶ 8; Aff. of C.A. at ¶1*. The principal, C.A. Triggs (Triggs), was not available. *Id*.

C.A. and T.L. returned to Robert Asp the next morning on the 14th of October 2014 to meet with the principal. *Aff. of T.L. at ¶ 10; Aff. of C.A. at ¶ 2*. T.L. and C.A. were visibly upset and asking questions about the storage closet. *Id*. Triggs asserted that this storage closet was used with other special needs children due to construction and limited space. *Id*. C.A. asked whether the building blueprint would reflect that the room J.A. was in was a storage closet. *Id*. The principal confirmed that C.A. was correct. *Id*. Once T.L. and C.A. showed Triggs a picture of the storage closet, Triggs became nervous and apologetic. Triggs stated that the person who gave T.L. the tour was wrong to show her that room. *Aff. of T.L. at ¶ 11*. When C.A. and T.L. stated they had no intention of returning J.A. to Robert Asp, Triggs told both T.L. and C.A. that it was against the law to keep J.A. from her education. *Id*. Both T.L. and C.A. understood Triggs to mean that they would be in trouble with the law if they refused to return J.A.[2] *Id*.

Unable to answer any of the Plaintiffs' basic questions regarding J.A.'s placement in the storage closet, Triggs took notes during the meeting and deferred answering any questions until he could consult with his supervisors and gather more information. *Id*. Triggs scheduled a meeting between himself, T.L. and Pat Sullivan (Sullivan), a Moorhead special education coordinator, the following day, the 15th of October 2014. *Aff. of T.L. at ¶¶14-15*.

On the 15th of October 2014, T.L. met with Triggs and Sullivan. *Id.* Neither C.A. nor

---

[2] The Minnesota Compulsory Attendance statute requires that children beginning at the age of seven are required to be in school. Minn. Stat. 120A.22, subd. 5.

T.L. wanted J.A. to return to Robert Asp and T.L. repeatedly stated that throughout the meeting. *Id.* Triggs responded to T.L. by stating to her that it was against the law to keep J.A. from her education. *Id.* T.L. understood Triggs to mean that if she kept J.A. out of school, she would be in trouble with the law. *Id*. Sullivan and Triggs informed T.L. that they were willing to permit J.A. to remain at home until the 22nd of October 2014. *Id.* During this meeting Sullivan appeared upset and teary and repeatedly apologized to T.L. *Id*. Triggs also repeatedly apologized. *Id*. Neither Triggs nor Sullivan discussed the storage closet with T.L. and were unable or unwilling to answer T.L. and C.A.' questions including how J.A. came to be confined in the closet, how many times she was in the closet, for what period of time, who went with her, and what was she doing in the closet. *Id*. Triggs agreed to make minor personnel changes, and stated that the storage closet would not be used with J.A. and that he had located another classroom for her. *Id*. T.L. was shown the new classroom. *Id.* Throughout the meeting and subsequent tour, T.L. repeated that she did not want J.A. to return to Robert Asp and did not want J.A. working with the same educators. *Id.* Both Sullivan and Triggs were focused on getting J.A. back into school because, as Triggs and Sullivan asserted, it was "against the law for [J.A.] not to be returned." *Id.*

J.A. in September 2014 began refusing to go to school and tantrum to avoid it. *Id.* She regressed in her communication skills at home. *Id.* J.A. also experienced an increase in her allergy symptoms throughout the year. *Id*. J.A. will be seeing see a child psychologist to identify and address the damage done to her. *Id.*

J.A. was returned to Robert Asp on the 22nd of October 2014. During this time, Plaintiffs began to look for counsel to represent J.A. *Id*. On advice of counsel, T.L. and C.A. immediately stopped sending J.A. to school. *Id*. At the time the Complaint was filed, T.L. and C.A. had nothing in writing from MPS or an authorized representative for the Board of Education

5

reflecting that it will immediate stop the practice of isolating, confining and segregating J.A. into a storage closet as part of her education day. *Id*.

J.A. is unable to report if she has been taken back to the storage closet. *Id*. The Plaintiffs are seeking emergency injunctive relief to temporarily and permanently restrain MPS from the use of a storage closet for any educational purposes with J.A. or any other special needs child. *Id*.

Dr Richard Ziegler, Ph.D., L.P., a Pediatric Neuropsychologist with the University of Minnesota, Division of Clinical and Behavioral Neuroscience examined the picture of the storage closet represented in Attachment A. Dr Ziegler characterized it as "a re-purposed storage closet", outside any acceptable professional standards, and "an unreasonable and dangerous area for a disabled child." *Declaration of Dr Richard Ziegler* (Ziegler) [Docket No. 25]

**ARGUMENT**

Plaintiffs are not required to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA") for claims under Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA") and the Minnesota Human Right Act ("MHRA"). The claims before the Court are disability discrimination claims like those found in *M.P. v. Indep. Sch. Dist. No. 721*, *New Prague*, 439 F.3d 865 (8th Cir. 2006) and *A.P. v. Anoka-Hennepin, Indep. Sch. Dist. 11*, 538 F.Supp.2d 1125 (D. Minn. 2008).

**I. ADMINISTRATIVE EXHAUSTION IS NOT REQUIRED FOR DISABILITY DISCRIMINATION CLAIMS UNDER SECTION 504, THE ADA AND THE MHRA.**

Defendant seeks dismissal by arguing incorrectly that a plaintiff with a disability bringing a Section 504, ADA or MHRA claim against a public school must first exhaust administrative remedies under the IDEA. The exhaustion analysis plainly stated is (1) whether Plaintiffs' federal law claims implicate § 1415(*l*)'s administrative exhaustion requirement; (2) if these

claims do implicate the requirement, whether Plaintiffs have, in fact, exhausted the administrative procedures set forth in §§ 1415(f) and (g); and (3) if these procedures were not exhausted, whether Plaintiffs' failure to exhaust is excused. Plaintiffs have maintained that the claims before this Court do not implicate the IDEA and are instead disability discrimination claims under Section 504 and the ADA. Assuming this Court were to conclude that the IDEA is implicated in the claims, Plaintiffs argue that the IDEA does not reach the location or facilities of the educational services and placement. The claims sound in *comparable facilities* and *integration* mandates under Section 504 and the ADA.

The Eighth Circuit has concluded that plaintiffs suing under Section 504 do not need to first exhaust administrative remedies. *Miener v. Missouri*, 673 F.2d 969, 978 (8th Cir. 1982); *see also Smith v. Branton*, 914 F.2d 1330, 1338 (9th Cir. 1990). Nor is there an administrative exhaustion requirement in Title II of the ADA. *See* 42 U.S.C. § 12131 *et seq*. Defendant argue that because the child is disabled and the discriminatory conduct took place within the Defendant's school, administrative exhaustion under the IDEA must take place. The Defendant further argues that because its discriminatory conduct arguably adversely affected the Plaintiff's education, Plaintiffs are required to exhaust administrative remedies. While it is true that students receiving special education services must pursue claims related to those services through an administrative due process hearing, the case before this Court does not involve a challenge to J.A.'s educational services or placement. *See generally* 20 U.S.C. § 1415.

The IDEA provides the following exhaustion language:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 et seq.], ***title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 et seq.],*** or other Federal laws protecting the rights of children with disabilities, ***except that before the filing of a civil action under such laws seeking relief <u>that is also available under this subchapter</u>, the procedures under subsections (f) and (g) shall be exhausted***

7

> *to the same extent as would be required had the action been brought under this subchapter*.

20 U.S.C. § 1415(*l*)(Emphasis added.) While Congress required exhaustion in those cases wherein relief under the IDEA is available, it also expressly preserved other remedial schemes 20 U.S.C. § 1415(*l*).

The Eighth Circuit has examined the exhaustion requirement under the IDEA as it impacted other constitutional and statutory claims. The Court has consistently found that even where an IDEA claim and a Section 504 claim are brought together in a lawsuit and the IDEA claim is dismissed for failure to exhaust administrative remedies, the Section 504 claim may still be heard. *M.P. v. Indep. Sch. Dist. No.721,* 439 F.3d 865, 868 (8th Cir. 2006);see also *Thompson v. Bd. of the Special Sch. Dist. No. 1*, 144 F.3d 574, 576 (8th Cir. 1998) (finding that where a student has failed to exhaust his administrative remedies under the IDEA, the Court will consider his Section 504 claim separately from his IDEA claim). In *M.P.* the student brought claims in federal court under, *inter alia*, the IDEA, Section 504 and the ADA. Because M.P. did not exhaust his administrative remedies, the IDEA claims were dismissed and the case was remanded for trial on the merits for those claims outside the IDEA. *Id*. Despite the failure to exhaust, the Court concluded that M.P., nevertheless, had a right of action for damages under Section 504. *Id.*

In this case, the Plaintiffs raised no IDEA claims because there is no contest to the educational services or placement. The IDEA differs from Section 504 and the Americans with Disabilities Act, because it is a *remedial* statute designed to redress perceived obstacles to education by providing additional programs or services to individual students with qualifying

8

disabilities in order to help the individual student achieve certain individualized goals.[3] It is individual-specific and focuses on the identification of a qualifying disability and the development of an individualized education program ("IEP") in order to provide special or additional services or accommodations meant to achieve the goals set forth in the IEP. The IEP then guides the school and student with regards to modified educational goals and means and accommodations to achieve those goals.

In contrast to the IDEA, Section 504 and the ADA are broad civil rights statutes. At their core, these are anti-discrimination statutes and effective participation laws established to create a "level playing field," eliminate barriers to entry and equal participation, and ensure comparable treatment as between disabled and non-disabled individuals. *See* 29 U.S.C. § 794 and 42 U.S.C. § 12132. Section 504 prohibits recipients of federal funding, including public school districts, from engaging in disability discrimination. 29 U.S.C. § 794(a),(b)(2)(B). The ADA prohibits all public entities from discriminating against individuals with disabilities. 42 U.S.C. § 12132.

The claims before this Court are not about the educational services and placement but rather about a "level playing field" in the form of a comparable facility. The IDEA does not address or remedy the use of a re-purposed storage closet that is outside of any acceptable professional standards, and was an unreasonable and dangerous environment for any disabled child. See *Decl. Ziegler*.

---

[3] The child's annual goals, including academic and functional goals, are designed to address the child's disability and related needs so as to enable the child to participate in and make progress in the general education curriculum aligned with the state's academic content standards established for all students. 34 C.F.R. § 300.39. Through special education and related services (as outlined in the IEP) students with disabilities are enabled to become proficient and advanced in the state's academic content standards. 20 U.S.C. § 1401(9)(B); 20 U.S.C. § 6311(B); 34 C.F.R. § 200.1(a),(b),(c); *see also* 29 U.S.C. § 794, 34 C.F.R. § 104.4.

## A. "Educational Placement" is Not Synonymous with Location of Services.

Plaintiffs anticipate that Moorhead will argue that Plaintiffs can challenge the facilities under the "educational placement" provisions found in the IDEA. However, "placement" under the IDEA is a term of art identifying not a physical location but rather the series of procedural safeguards undertaken to effect the educational services that make up the educational placement. 34 C.F.R. § 300.116.

The Eighth Circuit has not directly examined whether location or services constitutes a placement under the IDEA. The Fourth Circuit, however, did in *A.W. v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674 (4th Cir. 2004). The court, joined the Fifth Circuit Court of Appeals, by concluding that an *educational placement* does not include the location of the services. The court in *A.W.* took pains to examine the issue in relation to the principles of statutory construction and the general purpose and scheme of the IDEA. As the court in *A.W.* noted:

> Consideration of the structure and the goals of the IDEA as a whole, in addition to its implementing regulations, reinforces our conclusion that the touchstone of the term "***educational placement" is not the location to which the student is assigned but rather the environment in which educational services are provided***. To the extent that a new setting replicates the educational program contemplated by the student's original assignment and is consistent with the principles of "mainstreaming" and affording access to a FAPE, the goal of protecting the student's "educational placement" served by the "stay-put" provision appears to be met.

*A.W.*. 372 F3d at 681-82; see also *White ex rel. White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379 (5th Cir.2003)("'education placement' is not a place but a program of services")(citations omitted).

Since the "educational placement" identified in the IDEA, as defined by sister circuits, does not include the location of the services, a challenge to the location of education services is outside the reach of the IDEA. The distinctions, between what claims fall within which act, have been examined by this Court and the Eighth Circuit. The Court in *A.P.* drew the distinction in

10

claims deftly:

> AP's parents asked District 11 to accommodate AP's diabetes so that he would be safe and healthy at Adventures Plus; this is more like asking District 11 to accommodate a wheelchair-bound student by installing a ramp, or widening doors than it is like asking for specific educational services.

*A.P.*, at 1146-47. Just as the Court in *A.P.* found that the IDEA does not cover claims related to widening a door or installing a ramp, it does not cover claims regarding the facility in which the child is being educated. Without belaboring the point, an example of this distinction can be illustrated in this case, as well. If the Plaintiffs were challenging that the goals and objectives on J.A.'s IEP, that J.A. was not properly evaluated, or that J.A. is not receiving sufficient services in a particular need area, administrative exhaustion would be required. Placing J.A. into a substandard education facility, identified as "re-purposed storage closet" that was "unreasonable", did not comply with acceptable professional standards and was "dangerous" for a child with a disability (*Decl. Ziegler*) is distinctly separate from her IEP and the provision of a free appropriate public education. As in *A.P.*, the claims raised here are related to the facility in which J.A. is being educated and not the IEP and special education services that are being delivered.

Moorhead cited *A.C. v. Moorhead*, No. 06-3099 (DWF/RLD), 2006 WL 3227768 D. Minn. Nov. 7, 2006) for the proposition that Plaintiffs' Section 504 and ADA claims should be dismissed for a failure to exhaust IDEA administrative remedies. *Defendant's Brief at 14*. However, the Court in *A.C.* dismissed only the IDEA and IDEA-related claims and not, as Moorhead suggests, all claims made by A.C. regarding the use of Room 208. *A.C.* at *6-7. Moorhead is arguing the same position that was previously rejected by Judge Frank:

> In essence, Defendants argue that because they say Room 208 was intended for educational purposes, it must be so. The Court disagrees. Viewing the evidence in the light most favorable to A.C., the Court finds that there are genuine issues of material fact

> concerning the underlying legal issue of whether Counts One through Four are IDEA-related and thus subject to the exhaustion requirement. The Court therefore denies Defendants' motion with respect to this argument.

*A.C.* at *10. The use of a re-purposed broom closet, as the Court found, is not related to the student's IEP. *Id.* at 11.

The right to a free appropriate public education (FAPE) is a protected right under both the IDEA and Section 504. However, Plaintiffs did not challenge the provision of FAPE to J.A. under either the IDEA or Section 504. In other words, J.A.'s identification, evaluation, educational program and services are not contested.

Moorhead incorrectly argues that so long as the challenged actions impacted a child's FAPE, then the child must exhaust administrative remedies. This allegation as a basis for concluding a nexus between the IDEA and all other claims for relief under state and federal statutes has no authority in statute or case law.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Moorhead's Motion to Dismiss and find that Plaintiffs' disability discrimination claims under Section and the ADA may proceed without resort to administrative exhaustion under the IDEA.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: 16 December 2014   /s/ Margaret O'Sullivan Kane
Margaret O'Sullivan Kane /ID # 220243
Attorney for Plaintiffs
420 Summit Avenue
Suite 306
Saint Paul, Minnesota 55102
651/222-8611